## Commonwealth ex rel. Farnsworth v. Farnsworth

*Sidney B. Berg*, for relatrix.

*Otto W. Woltersdorf*, for defendant.

GILBERT, J., March 22, 1957.—On March 12, 1957, after hearing sur attachment, this court entered the following order, viz:

"Credit $80 paid direct and $140 paid direct at bar of court on arrears due wife. Orders and arrears suspended. Parties dealing direct."

Later the same day a petition to reinstate these orders and arrears was presented, which is now before us for disposition.

The petition provides an opportunity to call attention to an evil in the administration of court orders for support (present in part in this case), which has plagued the judges and personnel of this court for many years. It is an evil which has been created by

the indifferent manner in which many husbands and wives have abused the administration and execution of such orders.

Inherent in the practice in effect for many decades is the requirement that payments under support orders entered by the Municipal Court shall be made to the clerk of quarter sessions, the officer designated by law to receive and disburse all payments directed to be made by defendants subject to the jurisdiction of a quarter sessions court. Liability for support in these cases is established by sections 731 and 733 of The Penal Code of June 24, 1939, P. L. 872. For these purposes such clerk is designated as the clerk of the Municipal Court. See section 4 of the act creating the Municipal Court of July 12, 1913, P. L. 711, as amended by the Act of June 15, 1915, P. L. 988.

The clerk of quarter sessions maintains a department of accounts which occupies spacious quarters in the Municipal Court Building at 1801 Vine Street, for the receipt and disbursement of all such moneys.

In 65 counties of the State where no additional trial courts exist (as they do in Allegheny and Philadelphia Counties), petitions for support orders are heard by common pleas judges sitting in quarter sessions courts.

The attachment here involved was issued by our delinquent department on February 21, 1957, covering arrearages on two orders entered pursuant to a reciprocal petition forwarded here from the Burlington County (New Jersey) Juvenile and Domestic Relations Court. The order entered therein under date of October 14, 1955, is for $120 per month for the support of two children of defendant and his wife, relatrix herein, and the order entered February 8, 1956, pursuant to the same petition, is for $20 per week for the support of the wife.

Examination of the records of our department of accounts shows that since their entry the total sums

of $2,040 and $1,140 have become due on the orders for the children and the wife, respectively, and that the only money paid to the department of accounts by defendant on both orders is the lump sum of $300, paid May 23, 1956, on the order for the wife. Nothing has been paid by defendant into the department of accounts on the order for the children. The department records, as of March 12, 1957, further reveal that on four different dates credits totaling $1,560 have been given on the children's order for direct payments made outside the court, leaving a balance due on this order of $480, and that also on four different dates such direct payments totaling $580 have been credited to the wife's order, leaving a balance, after also crediting the said $300 payment to the court, of $260 due thereon.

Before going into the facts and merits of the case at bar, it is deemed necessary to discuss in general the entry, administration and execution of orders for support entered by this court.

Such cases reach the court when the dependent, usually the wife, seeks the aid of the court, and files a petition, usually drawn by a clerk of the court, seeking an order from her husband for support of herself and/or children. After a hearing, an order is made (except when for sufficient reason the petition is dismissed).

The court maintains a delinquent department, staffed by clerks at taxpayers' expense, whose duty is to keep an eye on all delinquent accounts and, where the wife or the Department of Public Assistance (where beneficiaries have been on, or are applying for, relief) does not do so, to issue attachments to bring in delinquents for hearing. This requires much clerical work, which is wasted where the parties, as in the case at bar, have been dealing with each other direct.

The summary for the year 1956 recently released by the department of accounts shows that during the year 1956 the department received and disbursed a total of $8,076,121.98 in support payments, of which $6,912,700.48 represents moneys paid into the department of accounts under orders of support entered in the Domestic Relations Division of the court. It also shows 55,081 active and delinquent orders on the books of the department, for which accounts have to be maintained. Of these, 30,327 accounts are in the Domestic Relations Division alone.

From the foregoing it is seen also that after getting the protection of a court order, those who ignore the order to pay into court, or deal with each other direct on the outside, without the knowledge of the court, make it impossible for its department of accounts to keep accurate records for the protection of both sides.

When later one party brings the matter of any delinquency into court, the writer has yet to sit in one case out of the thousands of such matters he has heard within the last four years, since he has been on this bench, where either party had any itemized list of credits claimed, figured up and totaled, to present to the court. The situation is a gross imposition upon the court and has become intolerable.

Our department of accounts is plagued with the repeated necessity of going over accounts with defendants and beneficiaries who dispute the balance due by defendant, as shown in the department. Invariably they have no accurate figures of their own to present. Often defendant has a large bundle of receipts (for all or some of which, after a painstaking check by the judge or a clerk, they have already received credit), and memoranda and other data, not yet shown to the other side, which they expect the judge in open court to examine and reconcile for them. When these

complaints are sifted, it almost always develops that the difference represents direct payments made to the beneficiary of money or money value.

So long as this reprehensible practice is permitted to continue, there can be no assurance at any time that the balance, as shown in these numerous accounts, represents the correct amounts owing by defendants to beneficiaries. Any temporary inconvenience to the parties occasioned by their compliance with the terms of these orders is minor indeed in comparison with the hazard to public welfare which a continuation of the practice entails. The bad example set for thousands of other defendants make it imperative, for the protection of society, for us to take drastic steps to terminate the evil.

It frequently happens that, after an attachment has issued for a defendant, whose account shows an arrearage on the court's books, and who is served with notice to come in for a hearing, he fails to appear, necessitating the issuance of a bench warrant for him. It then develops that the parties have been living together for a large part of the arrearage period, or that direct payments to the wife have been made, or that for some other reason the parties have presumed to abandon the court order without the knowledge of the court. In the meantime the court has been obliged to carry the account on its books and has been put to the trouble of issuing what later appears to be an unnecessary bench warrant.

In addition to direct cash payments, defendants have claimed credits for such items as bicycles, clothing, Christmas presents, amounts received by beneficiaries (usually teenage children) for baby sitting and other temporary employment, periods when child beneficiaries lived with defendant and other miscellaneous items, against the paper arrearage piled up

in the department, of accounts because the court had no knowledge of such direct payments.

In many cases both these arrearages and the credits claimed thereagainst amount to many thousands of dollars, far exceeding the $2,500 civil jurisdiction of the court, albeit jurisdiction in the Domestic Relations Division, moneywise, is unlimited. Before a case would even reach a hearing in the civil division, claims and counterclaims are required to be itemized, totaled and notarized. In the Domestic Relations Division no one ever thinks of doing so.

All such claimants should be prepared with an itemized list of credits claimed, showing arithmetical calculations, dates covered, amounts involved and totals. On the many hundreds of occasions when the writer has, from the bench, ascertained the amounts of credits allowable, in order to help the parties, he has been obliged to extract the necessary data from witnesses who are often reluctant or unable to make responsive answers, including beginning and ending dates, do all the arithmatic himself and then himself find the total credit for allowance. This becomes quite a task and takes more time than can be spared (with usually 50 other cases on the hearing list), and places a heavy burden on the court reporter, whose job it is to take testimony, not to report investigation and preparation of cases. In many instances there are a half dozen such arithmetical calculations to be made, as in a case where, e.g., an order for support for several children, in a lump sum, has been allowed by the parties to continue in force for a year or so after the youngest becomes 18 years of age, and defendant now desires to receive credit against the paper arrearage which has accumulated in the department of accounts for the respective periods extending from the eighteenth birthday of each child down to

the date of the hearing, or where he claims credit for periods of vague duration, during which child beneficiaries had outside employment. The writer has yet to encounter a case where the parties or their attorneys have had such items figured out accurately in advance of the hearing.

Thus, what the judge really does in these cases is to conduct, not a hearing, but a conference, such as should be had in a lawyer's office prior to the hearing, wherein the judge actually prepares the case for both parties. In other words, the judge is forced either (1) to do the preparatory work, which is the obligation of the parties, or their counsel, or (2) to refuse to hear the case until they do so.

In order to avoid the latter alternative, since the support of dependents is involved, what usually happens is that the case is prepared at the bar of the court, while other cases await hearing.

Moreover, the writer has rarely sat in any case where defendant could even tell the court the amount of the total he claimed for credit, or where the wife, though admitting some direct payments, could give the total either. Rarely, too, does either know the amount owing where direct payments are not involved.

Many people become excited and emotional in Domestic Relations Court. The result often is, not a dignified hearing, where orderly testimony is taken, but a barrage of intemperate bickering, wrangling, altercation and cheap argument back and forth among the parties and counsel. Angry assertions and denials often follow each other in rapid succession. Frequently several persons are talking at the same time, making it impossible for the court stenographer to get any of it, except perhaps the statements of the one who happens to be talking the loudest. The notes taken by the stenographer have to be transcribed in due course, and read by the hearing judge before they may be

filed away in the court records. Seventy-five percent of it has no evidential value whatever.

Our court reporters have been obliged to take thousands of pages of unnecessary "testimony", if indeed, we may call it such for expediency, in order to make adjustments in our accounts necessitated by these direct payments.

On numerous occasions, the court, in self-defense, is forced to tell the parties, and sometimes to order them, to go outside the courtroom and attempt to agree upon the total of the payments made direct to the beneficiary. In nearly all these instances the court would be justified in dismissing the claim for credit because submitted orally and vaguely in unitemized, uncalculated and untotaled form, because the other side has not in advance of the hearing been supplied with a copy of such claim or in some cases with even any information that such a claim would be made and because such claim is improper since direct payments are in violation of the requirement to pay through the court, and virtually no testimony is ever offered to rebut the presumption that they are voluntary payments, or gifts, in addition to the court order.

This is the general difficult situation constantly facing the court in these attachment hearings.

While no itemized lists of credits claimed were involved in the case at bar, let us examine the record to see to what degree the parties before us have complied with the orders here involved, and to what extent they, by their direct dealings with each other outside the court, have added to the court's burdens.

These parties separated March 27, 1943, and the record of their marital difficulties in this court begins March 29, 1943. Since then hearings in open court on various phases of the case have been held on *20* different occasions, up to and including the last hearing on March 12, 1957.

In addition to the official records, consisting of pleadings, attachments, transcripts of testimony, original orders and the like, the court personnel keeps a file of information, much like a lawyer's file, except that the court's file contains information relating to both sides alike. The correspondence, memoranda and other papers concern not only court appearances, but reports of visits by the parties to the court building at 1801 Vine Street between hearings, the substance of their conversations with and complaints to court personnel, both oral and written, conferences among parties and court personnel in an attempt to reach an agreement, reports by probation officers and other investigations by the court in this and other jurisdictions to ascertain facts, locate parties or secure any information necessary for hearing and disposition. This information is of great value in forming a basis for questioning the parties and their witnesses at hearings in open court.

Minutes in date order are kept by the personnel as to all these items. In the case at bar there are *84* such minutes or entries listed in the court's file, beginning March 29, 1943, and ending March 12, 1957. All these entries are copious in content, either within themselves or because they include by reference correspondence, reports and other papers attached thereto.

On the front of the file is affixed a printed form containing the names of the parties and their children, birth dates, place of residence, race and religion, names and addresses of relatives and home addresses. Under the latter category are nine entries, indicating nine different addresses. The court expects parties to notify it of all changes of residence. The parties frequently fail to do so. Also included are occupations, verifications of earnings and names and addresses of counsel.

The file also contains full page reports showing the results of medical examinations of both defendant and his wife by the court's physicians.

Correspondence therein shows that in 1949 there was an order of $20 a week in Bucks County against defendant for the support of his children. Included also is a letter from the clerk of the Juvenile and Domestic Relations Court of Burlington County, Mount Holly, N. J., dated November 18, 1955, advising this court that the wife had "received two checks for thirty dollars directly from her husband. This money should have been paid through our Probation Department", continues the letter, "and we will ask that you see that this is done in the future, in order to protect both Mr. Farnsworth and Mrs. Farnsworth." This was followed by a letter from this court to defendant advising him accordingly.

There are seven transcripts of testimony in this record. In the transcript of a hearing on December 9, 1955, not involving an attachment, the wife stated in open court that she had received $120 from defendant, not through the court, but "through personal money orders from the PSFS."

On January 16, 1956, Sidney B. Berg, Esq., entered this case as the wife's counsel by his letter of that date. Under date of November 6, 1956, Mr. Berg, instead of filing an affidavit for an attachment, the correct practice, *wrote* to the supervisor of our Domestic Relations Division, advising that "On October 18, 1956, Judge Hoffman sentenced the defendant to thirty days or the payment of $310.00 owing on arrearages. The defendant claimed he had paid to his wife $120.00 but only produced receipts for $60.00 and I have continuously requested his attorney, Henry Drizin, Esquire, to show me the other receipts but he has failed to do so. Defendant did not serve any time as he was released upon payment of $190.00 and it

was conditioned upon his showing me these receipts. *My client writes me* [italics ours] that he is again three weeks in arrears again. May I thank you to set this up again for another hearing on an Attachment at any early date you can find."

Mr. Berg again *wrote* similarly to our supervisor under date of February 8, 1957, advising that "the defendant again is in arrears in the sum of $80 on his wife's order which is for $20 per week. May I thank you to issue an Attachment and set this up for an early hearing."

Attachments may be issued only upon affidavit, showing the correct amount of arrears. The impropriety, to put it mildly, of expecting some one in our delinquent department to make such affidavit based upon the foregoing letters, especially in the circumstances described in this opinion, is quite apparent.

In the transcript of April 3, 1956, this colloquy between court (Propper, J.) and counsel appears:

"The Court: As I understand, nothing has been paid on the order, which was made on 10-14-55.

"Mr. Berg: That's being paid. That order is being maintained, but there is a later order.

"The Court: "You say it is being maintained, Where is it being maintained, privately?

"Mr. Berg: He is sending it directly.

"The Court: I do not want any order on our books that are sent directly. Therefore, I can vacate it?

"Mr. Berg: No.

"The Court: We have enough problems, as you well know, in this court without having further bookkeeping problems where money is being sent directly and this court knows nothing about it. We can go crazy with this sort of thing.

"Mr. Berg: As to the order made on 10-14, the wife desires to give her husband credit for the sum of $540, I believe.

"(Discussion off the record.)

"The Court: Therefore, you want a credit of $540?

"Mr. Berg: Yes.

"The Court: How about the other order?

"Mr. Berg: The other order he is not complying with at all, $20 a week. That is the order of February 8, 1956."

Of the 20 hearings had in this matter, 10 were on attachments against defendant for failure to pay the orders, direct or otherwise. One occurred November 1, 1943, under another order for a child, vacated in 1950. The other nine all concern defendant's failure to pay the two orders here concerned. These hearings took place on March 27, 1956, April 3, 1956, August 21, 1956, September 20, 1956, October 18, 1956, October 30, 1956, November 29, 1956, December 13, 1956 and March 12, 1957. At six of these nine hearings credits were given for payments made direct to the wife on one or both orders. In addition, on December 5, 1955, sur petition of the wife not involving an attachment, another credit for direct payment of $60 was approved by the court.

At the hearings on March 27, 1956, August 21, 1956 and October 30, 1956, attachments were continued. On the latter two dates bench warrants were issued for defendant.

At the last hearing on March 12, 1957, Mr. Berg stated that "this is an attachment of the order which this Court entered in favor of the wife only, which was made February 8, 1956, in the sum of $20.00 a week. There was another order made prior to the wife's order, which was for two children, which was $120.00 a month. We are not here on that order, we are here only on the wife's order of $20.00 a week." We observe at this point that, if counsel had examined the affidavit for the attachment, he would have noted that it covers both orders. "The husband," continued counsel, "*gen-*

*erally makes his payments direct to the wife* [italics ours], which of course—

"The Court: Which is in violation of the Court order.

"Mr. Berg: "Yes, it is. [Then, with unaffected simplicity, he continues] When we came up on attachments, we have always credited him with whatever payments he has made."

The 10 pages of so-called testimony taken at this hearing actually comprises negotiation at the bar of the court that should have taken place elsewhere. It resulted in credits of $80 and $140 being allowed against the arrearage of $260 on the order for the wife, leaving $40 still due. It also contains the interesting statement of defendant's counsel, after the hearing judge complained about the propensity of these parties to make and receive direct payments, that "we are also in agreement hereafter to pay the money through the court," thus raising the implication that the requirement to do so is subject to agreement or modification at the whim of the parties or their counsel, and is to be obeyed or not as they see fit.

There followed further wrangling about (1) the advisability of attaching defendant's wages earned at his job as an engineer for the Reading Railroad, and (2) the amount of the arrearage on the $120 per month order for the children, on which a balance due of $480 was shown on the record of the department of accounts. Defendant insisted he was overpaid by $60, but the wife argued he was entitled to a credit for (once again) direct payments totaling only $420, leaving $60 due. Mr. Berg said he was "willing" to credit defendant with $420, but Mr. Woltersdorf, for the husband, remonstrated.

"It is not a question of willingness, if your Honor please," said Mr. Woltersdorf, "the husband paid [in full]."

"Mr. Berg: If Mr. Woltersdorf will produce the proper receipts, we will give him credit, and I ask your Honor in order to avoid this confusion [caused by the parties] in the future that you attach on both orders.

"Mr. Woltersdorf: I have checked the receipts, and we are up to date.

"The Court: Direct payments?

"Mr. Woltersdorf: Direct payments.

"The court: That is why we have no record of them. Orders and arrears suspended, parties dealing direct."

The credit in dispute, $420 or $540, whatever it was, never got to the point where it was ascertained. Hence, no credit was allowed, so that the court account of the children's order still shows an arrearage of $480.

After all these reminders in the prior record of the trouble, confusion and waste of time caused by these annoying direct payments, and the bookkeeping and procedural problems they pose, especially the threat of Judge Propper to vacate one of the orders as related, and keeping in mind the understanding of such problems, which we certainly have a right to assume that counsel, as well as the parties, all adults, must have, it seems incredible that, at yet another hearing, we detected no consciousness on their part of any impropriety in the continuance of the same obnoxious practices.

The petition also asks that the court attach the salary of defendant for payment of both orders "so as to insure payments being made through the proper channels of your Honorable Court [sic]".

Defendant objects to such attachment, on the ground that he is overpaid by the sum of $60 on the order for the children, and that it is admitted he owes only $40 on the order for the wife. She argues that he is in arrears $60 on the children's order. Although

this court receives good cooperation in this regard from the Reading Company, his employer, yet it is not to be denied that a wage attachment does not improve relations between employer and employe.

While we feel that his conduct in persistently paying these orders direct in the past deserves our condemnation, yet, as appears supra, they are in fact substantially paid up. Hence, we see no justification for an attachment of his wages.

We have decided to reinstate the orders and arrears, and an order will be entered accordingly. However, we will also direct that the accounts of payments and disbursements under both orders in the clerk's office be marked closed, and that all future payments on the orders and arrears be made by defendant direct to the beneficiary. In future no attachments shall be issued by our delinquent department, but such attachments may issue only on presentation of petition in due form, signed and sworn to by the beneficiary, in which the amounts due under the order and direct payments thereagainst shall be itemized, and fully explained in detail and totaled, and the balance claimed to be due clearly shown and stated, and that no hearing thereon shall be fixed until at least 20 days after a copy of said petition is duly served upon the defendant.

Closing these accounts and requiring future payments to be made direct to the beneficiary should cause no hardship for these parties, for they have by their past conduct clearly shown their preference for that method. But it will have the salutary effect of relieving the court clerk's office personnel of the nuisance to which they have been subjected in trying to keep track of the debits, credits and balance due under the difficult circumstances heretofore created and maintained by the parties.

And now, March 22, 1957, we enter the following:

*Orders*

1. The support orders of October 14, 1955, and February 8, 1956, and all arrears thereunder, are reinstated. The accounts of these orders in the clerk's office are directed to be closed forthwith. Defendant will make all future payments on both orders and arrears direct to beneficiary.

2. The attachment of February 21, 1957, is dismissed. Future attachments will be issued only on presentation and service of petition by the beneficiary, in the form and manner defined in this opinion.

Notify parties and counsel.